1
2
3
4
5
6
7
8

9          **UNITED STATES DISTRICT COURT**

10         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12   D&P DESIGN, LLC,                              CASE NO. 09cv1142 WQH (BLM)

13                              Plaintiff,         ORDER

14         vs.
     MED-1 PARTNERS, LLC,

15                              Defendant.

16   HAYES, Judge:

17         The matters before the Court are the Motion to Transfer (Doc. # 6) and the Motion to

18   Dismiss (Doc. # 9, 20).

19   **I.    Background**

20         On May 27, 2009, Plaintiff D&P Design, LLC ("D&P") initiated this action by filing

21   a Complaint against Defendants Med-1 Partners, LLC ("Med-1"), Jeff Fisher and Luther

22   Schriefer.  (Doc. # 1).  On June 2, 2009, D&P filed a First Amended Complaint ("FAC")

23   against Defendants Med-1, Jeff Fischer and Luther Schriefer.[1]  (Doc. # 3).

24         **A.    Allegations of the FAC**

25         On February 5, 2009, D&P (a California corporation with its principal place of business

26   in San Diego County, California) and MED-1 (a Delaware corporation with its principal place

27   _____

28         [1]   The FAC corrected the spelling of the last name of Defendant Jeff Fischer.
     Otherwise, the allegations of the original Complaint and the FAC are identical.

of business in Bethesda, Maryland) "entered into a written agreement (the 'Agreement') providing, among other things, that D&P would be the exclusive distributor for MED-1 in India ... for the sale of MED-1's Mobile Medical Facilities ('MMFs'). The Agreement was signed by Fischer as Managing Director of MED-1. The Agreement provided that the MMFs would include mobile emergency departments, mobile cardiac facilities, mobile diagnostic facilities and mobile medical clinics." (FAC, Doc. # 3, ¶¶ 1-2, 9). "The parties agreed that the Agreement would be for two years and D&P would be paid 10% of the gross sales price from the sale of MMFs in India." (*Id*. ¶ 10). "The parties further agreed that they would enter into an agreement whereby MED-1 would pay D&P 10% of the gross sales price from the sale of MMFs to parties ... introduced to MED-1 by D&P." (*Id*. ¶ 13).

"Based on the Agreement, MED-1 caused business cards to be made for three representatives of D&P identifying them as MED-1's Lead Country Advisors in India. The business cards listed MED-1's business address and phone number in Bethesda, Maryland, and listed separate e-mail addresses on MED-1's domain address. MED-1 also set up e-mail accounts at MED-1 with passwords for D&P representatives. MED-1's representatives introduced D&P representatives as MED-1's Lead Country Advisors for India." (*Id*. ¶ 14).

"In reliance on MED-1's promises, and the Agreement," representatives of D&P traveled to India and introduced Med-1 representatives to a potential buyer of Med-1's MMFs. (*Id*. ¶¶ 15-16). Representatives of D&P also introduced Med-1 representatives "to two potential agents for the sale of MMFs in Jordan and Iraq." (*Id.* ¶ 17).

"On March 31, 2009, MED-1 sent D&P a draft 'Representative Agreement' that was inconsistent with the terms of the Agreement. By way of example only, it proposed a one year term, not two years, and it proposed an unspecified percentage of the net sales price, not 10% of the gross sales price as agreed in the Agreement. The draft 'Representative Agreement' also did not include any provisions regarding payments to D&P from the sales of MMFs to parties outside India introduced to MED-1 by D&P." (*Id.* ¶¶ 20-21).

On April 8, 2009, "Schriefer on behalf of MED-1 denied that D&P were MED-1's Lead Country Advisors for India at that time, and demanded that D&P cease holding itself out as

such." (*Id.* ¶ 24). "On April 29, 2009, Schriefer on behalf of MED-1 sent D&P a letter unilaterally terminating the Agreement, and demanding that D&P cease holding itself out as MED-1's Lead Country Advisor in India or elsewhere." (*Id.* ¶ 28).

The FAC alleges claims for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) intentional misrepresentation, (4) false promise, and (5) negligent misrepresentation. With respect to the first two causes of action, D&P alleges that "D&P has suffered damages in an amount to be proven at the time of trial, but not less than $75,000." (*Id.* ¶¶ 33, 39). D&P seeks compensatory and punitive damages. (*Id.* at 7-10).

### B.    Motion to Dismiss and Motion to Transfer

On June 19, 2009, Defendants filed the Motion to Dismiss on the following grounds: (1) the Court lacks subject-matter jurisdiction; (2) the Court lacks personal jurisdiction over the Defendants; (3) the venue is improper; (4) the FAC fails to state a claim upon which relief can be granted.[2] (Doc. # 9). On June 19, 2009, Defendants filed the Motion to Transfer, moving the Court to transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Columbia or to the United States District Court for the District of Maryland, Greenbelt Division. (Doc. # 6).

In support of the Motion to Transfer and the Motion to Dismiss, Defendants attached a Declaration from Jeff Fischer, Director of Business and Government Affairs for Med-1, a Declaration from Luther Schriefer, Managing Director for Med-1, and a copy of the "Agreement" referenced in the FAC.[3] (Fischer Decl., Doc. # 7-3, ¶ 3; Schriefer Decl., Doc.

---

[2] The Motion to Dismiss, filed on June 19, 2009, referenced only the initial Complaint. (Doc. # 9). On July 28, 2009, Med-1 refiled the Motion to Dismiss to reference the FAC. (Doc. # 20). On August 13, 2009, the Court granted Med-1's "Ex Parte Motion for an Order Deeming Its Pending Motion to Dismiss Responsive to Plaintiff's First Amended Complaint," and ordered that "[a]ll briefs and other materials submitted by the parties in support of, and in opposition to, the Motion to Dismiss the original Complaint (Doc. # 9) will be deemed applicable to the Motion to Dismiss the First Amended Complaint (Doc. # 20)." (Doc. # 26 at 1). The Court also provided D&P an opportunity to supplement its opposition to the Motion to Dismiss. (Doc. # 26 at 1).

[3] D&P does not challenge the authenticity of the Agreement submitted by Defendants. (Opp'n to Mot. to Dismiss, Doc. # 16, at 14-15 (citing to "Defendant's Ex. 1" as the Agreement)). The Court takes judicial notice of the Agreement, Doc. # 7-2, Ex. 1. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d

1   # 7-4, ¶ 3).

2       On July 7, 2009, D&P voluntarily dismissed Defendants Jeff Fischer and Luther

3   Schriefer without prejudice pursuant to Federal Rule of Civil Procedure 41(a).  (Doc. # 11).

4       On July 13, 2009, D&P filed an opposition to the Motion to Dismiss and Motion to

5   Transfer, including a Declaration from Darya Nasr, co-owner of D&P, and a Declaration from

6   Mukesh Assomull, the husband of Priya Waney Assomull, co-owner of D&P.  (Nasr Decl.,

7   Doc. # 15-3, ¶ 1; Assomull Decl., Doc. # 15-8, ¶ 1).

8       **C.      Evidence Submitted by the Parties**

9       Med-1 is not a citizen of California, does not have any offices in California, is not

10  authorized to do business in California, and "does not regularly do or solicit business, engage

11  in any other persistent course of conduct in California or derive substantial revenue from

12  goods, food, services, or manufactured products used or consumed in California."  (Fischer

13  Decl., Doc. # 7-3, ¶¶ 5-8).  Both Fischer and Schriefer live in the Washington D.C. area and

14  work at Med-1's offices in Bethesda, Maryland, approximately two miles from the District of

15  Columbia.  (Fischer Decl., Doc. # 7-3, ¶¶ 1, 25; Schriefer Decl., Doc. # 7-4, ¶¶ 27-28).

16      D&P is a California limited liability company with its primary place of business in the

17  home of co-owner Assomull in La Jolla, California.  (Nasr Decl., Doc. # 15-3, ¶ 2).  In July

18  2008, Nasr, D&P's co-owner, moved to Potomac, Maryland, where she currently lives.  (Nasr

19  Decl., Doc. # 15-3, ¶ 3).

20      In September 2008, Nasr, co-owner of D&P, and Schriefer, Managing Director for

21  Med-1, met for the first time during a flight from San Diego to Washington, D.C.  (Nasr Decl.,

22  Doc. # 15-3, ¶ 5).  On this flight, Schriefer told Nasr about Med-1's MMFs, said that Med-1

23  was "looking for agents in countries outside the United States," and gave Nasr his business

24  card.  (Nasr Decl., Doc. # 15-3, ¶ 5).

25      On November 6, 2008, Schriefer met with Nasr, the Assomulls, and Sahel Assar, Nasr's

26  sister, in Bethesda, Maryland.  (Schriefer Decl., Doc. # 7-4, ¶ 14; Assomull Decl., Doc. # 15-8,

27  ────────────────────

28  920, 925 n.2 (9th Cir. 2003) ("Under the incorporation by reference doctrine, [a district court]
    also consider[s] documents submitted by Defendants that were referenced in the complaint and
    whose authenticity has not been questioned.").

¶ 3).  "The purpose of this meeting was for introductions and to consider doing business in India."  (Schriefer Decl., Doc. # 7-4, ¶ 14).  On November 7, 2008, Fischer and Schriefer met with the Assomulls and Nasr in Washington, D.C.  (Schriefer Decl., Doc. # 7-4, ¶ 18).  "The purpose of the meeting was to introduce ... Fischer to those three individuals and to discuss how they might play a role in Med-1's efforts to sell mobile medical facilities in India."  (Schriefer Decl., Doc. # 7-4, ¶ 18).  On January 23, 2009, Schriefer met with the Assomulls and Nasr in Washington, D.C.  (Schriefer Decl., Doc. # 7-4, ¶ 19).  "The purpose of the meeting was to discuss with Mr. Assomull his concept of developing India as a market for Med-1."  (Schriefer Decl., Doc. # 7-4, ¶ 19).  On February 5, 2009, Fischer and Nasr executed the Agreement between Med-1 and D&P at Med-1's office in Bethesda, Maryland.  (Fischer Decl., Doc. # 7-3, ¶ 15).

The Agreement is in the form of a letter addressed to Nasr at D&P's La Jolla address, signed by Defendant Jeff Fischer on behalf of Med-1.  Below Fischer's signature is written, "Agreed and accepted on this 5th day of February, 2009 by D&P," followed by Nasr's signature.  (*Id*. at 2).  The Agreement provides that "Med-1 grants to D&P ... the exclusive distribution rights for MMFs to parties within India...."  (Defs.' Ex. 1, Doc. # 7-2, at 1).  The Agreement continues: "The exclusivity arrangements ... are intended to be a legally binding obligation of the parties.  However, the other details of the distribution arrangements set forth herein are not intended to be legally binding and are subject to the completion, to the mutual satisfaction of the parties, of the [master distributor agreement] between the parties containing normal terms and conditions of an agreement of that type."  (*Id.*)  The Agreement also provides that the "master distributor agreement" "shall be interpreted and construed in accordance with the law of the State of Delaware."  (*Id.*)

On March 26 and 27, 2009, Schriefer met with the Assomulls in Charlotte, North Carolina.  (Schriefer Decl., Doc. # 7-4, ¶ 20; Assomull Decl., Doc. # 15-8, ¶¶ 17-18).  "The purpose of this meeting was to tour the Med-1 facility located in Concord, North Carolina."  (Schriefer Decl., Doc. # 7-4, ¶ 20).

According to Fischer and Schriefer:

> Subsequent to the signing of the February 5, 2009 [Agreement], Med-1 ultimately decided to break off its discussions with D&P because of grave concerns that we had developed regarding the business practices of D&P, including Mr. Assomull's confession to [Fischer and Schriefer] that he had previously been convicted of a felony, and our subsequent determination that Mr. Assomull had served approximately five years in prison for money laundering. It was also the opinion of Med-1 that some of D&P's proposed business practices did not comport with the Foreign Corrupt Practices Act.

(Fischer Decl., Doc. # 7-3, ¶ 21; Schriefer Decl., Doc. # 7-4, ¶ 26). On April 24, 2009, MED-1's counsel called D&P's counsel "about ... information Med-1 wanted to assure compliance with the Foreign Corrupt Practices Act." (Swan Decl., Doc. # 15-2, ¶ 2). On April 29, 2009, Schriefer e-mailed D&P a letter, addressed to Nasr and Priya Waney Assomull at D&P's La Jolla address, terminating the Agreement. (Nasr Decl., Doc. # 15-3, Ex. 1 at 272-73). The letter, signed by Schriefer, states that Med-1 is "not confident at this time that engaging D&P ... would permit us satisfactorily to achieve [Med-1's] goals of transparency and compliance [with U.S. and foreign laws, including the Foreign Corrupt Practices Act]." (Nasr Decl., Doc. # 15-3, Ex. 1 at 273). The letter concludes: "At this time, Med-1 ... does not anticipate conducting business or marketing its mobile medical units to private entities in India or to any parties introduced to us by D&P. As a result, we are hereby terminating the Letter Agreement dated February 5, 2009 and request that you, Mr. Mukesh Assomull and D&P cease to hold yourselves out as Med-1's ... agents or representatives in India or elsewhere." (Nasr Decl., Doc. # 15-3, Ex. 1 at 273).

According to Med-1's evidence: "No meetings relating to the [Agreement] dated February 5, 2009 or any potential distribution agreement between Med-1 and D&P ever took place in the State of California." (Fischer Decl., Doc. # 7-3, ¶ 16; Schriefer Decl., Doc. # 7-4, ¶ 21). Both Fischer and Schriefer state: "All of the telephone and e-mail communications that I had with representatives of D&P after our meeting in Washington, D.C. regarding the potential relationship between Med-1 and D&P were made from Washington, D.C. or the surrounding metropolitan area." (Fischer Decl., Doc. # 7-3, ¶ 17; Schriefer Decl., Doc. # 7-4, ¶ 22). Both Fischer and Schriefer state that Dr. Gerald W. Fischer, residing in Bethesda, Maryland, is an individual "with knowledge relating to the relationship between Med-1 and D&P." (Fischer Decl., Doc. # 7-3, ¶ 27; Schriefer Decl., Doc. # 7-4, ¶ 30). Both Fischer and

Schriefer state that they possess documents related to the "potential relationship between Med-1 and D&P" in Washington D.C. and Bethesda. (Fischer Decl., Doc. # 7-3, ¶ 26; Schriefer Decl., Doc. # 7-4, ¶ 29). Both Med-1 representatives state that "it would pose a great burden for me to travel to California in connection with defending against Plaintiff's lawsuit." (Fischer Decl., Doc. # 7-3, ¶ 28; Schriefer Decl., Doc. # 7-4, ¶ 31).

According to D&P's evidence, "[d]uring the nearly eight month relationship, Med-1 and D&P, either through their representatives or lawyers, sent dozens of e-mails, documents, drafts and final agreements to or from San Diego, and participated in numerous telephone calls to or from San Diego. The two principals of D&P [i.e., Nasr and Priya Waney Assomull] met on numerous occasions in San Diego to discuss D&P's relationship with Med-1." (Assomull Decl., Doc. # 15-8, ¶ 17; *see also* Nasr Decl., Doc. # 15-3, ¶¶ 6, 9, 11-15.) Med-1 created business cards identifying the Assomulls and Nasr as Med-1's "Lead Count[r]y Advisors for India." (Assomull Decl., Doc. # 15-8, ¶ 11). These cards, as well as a "Med-1 specification book," were mailed to D&P in San Diego. (Assomull Decl., Doc. # 15-8, ¶¶ 11, 15).

In addition to the trips to Maryland, Washington D.C. and North Carolina described above, the Assomulls traveled to India in December 2008, where they "explored business opportunities for Med-1." (Assomull Decl., Doc. # 15-8, ¶ 5.) On February 6, 2009, Mukesh Assomull again traveled to India, where he "introduced ... Med-1 representatives to interested buyers in India and helped market Med-1's MMFs." (Assomull Decl., Doc. # 15-8, ¶ 12.) According to Mukesh Assomull, "[t]he out-of-pocket costs for these five trips, the legal costs related to D&P's work with Med-1, and other related miscellaneous expenses, along with the value of the time spent by the D&P representatives on their work for Med-1 exceed $100,000." (Assomull Decl., Doc. # 15-8, ¶ 19.)

## II.   Subject-Matter Jurisdiction

Med-1 moves to dismiss this action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). A federal court has subject matter jurisdiction over an action that either arises under federal law, or when there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. §§ 1331,

1332(a).  "When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001) (citation omitted).  "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted); *see also* 5B Wright and Miller, Federal Practice and Procedure: Civil 3d § 1350 (2004) ("Wright and Miller").  Facial attacks challenge the sufficiency of the pleading pursuant to Federal Rule of Civil Procedure 8(a)(1), "which means that the allegations in the complaint are insufficient to show that the federal court has jurisdiction over the subject matter of the case as [Rule 8] requires."  Wright and Miller § 1350.  A factual attack, on the other hand, permits the movant to challenge the substance of the jurisdictional allegations and "the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *see also Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

Plaintiff filed this action based upon federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).[4]  D&P is a California limited liability company with its principal place of business in California.  (FAC, Doc. # 3, ¶ 1; Nasr Decl., Doc. # 15-3, ¶ 2).  Med-1 is a Delaware limited liability company with its principal place of business in Maryland.  (FAC, Doc. # 3, ¶ 2; Fischer Decl., Doc. # 7-3, ¶ 4).  The FAC alleges an amount in controversy in excess of $75,000.  (FAC, Doc. # 3, ¶¶ 8, 33, 39, 48, 58.)  D&P seeks compensatory damages for its breach of contract and misrepresentation claims.  (FAC, Doc. # 3, at 9-10).  Under Delaware law, "compensatory damages are measured by the plaintiff's 'out-of-pocket' actual loss." *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000); *see also Chase Manhattan Mortgage Corp. v. Advanta Corp.*, No. Civ. A. 01-507 KAJ, 2005 WL 2234608, at *22 (D.

---

[4]  Section 1332(a) provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States."  28 U.S.C. § 1332(a)(1).

Del., Sept. 8, 2005) (applying rule to breach of contract damages).[5]  D&P submitted evidence indicating that D&P representatives have incurred over $100,000 in travel and other expenses "in reliance on Med-1's promises, and the Agreement." (FAC, Doc. # 3, ¶ 16; Assomull Decl., Doc. # 15-8, ¶¶ 5, 12, 19.)  D&P has satisfied its burden of establishing that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332(a).  The Motion to Dismiss for lack of subject-matter jurisdiction is denied.

### III.   Personal Jurisdiction

Med-1 moves to dismiss this action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper."  *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (citation omitted).  In the absence of an evidentiary hearing, "the plaintiff need only make a prima facie showing of the jurisdictional facts."  *Id.* (quotation omitted).  "Uncontroverted allegations in the plaintiff's complaint must be taken as true.  Conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor."  *Id.* (quotation omitted).

The exercise of personal jurisdiction over a nonresident defendant must be authorized under the state's long-arm statute and must satisfy the due process clause of the United States Constitution.  *See Pac. Atl. Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985).  "California's long-arm statute is co-extensive with federal standards, so a federal court may exercise personal jurisdiction if doing so comports with federal constitutional due process."  *Boschetto*, 539 F.3d at 1015; *see also* Cal. Civ. Pro. Code § 410.10.  Due process requires that a defendant have such "minimum contacts" with the forum state that the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1954).  Under due process analysis, a defendant may be subject to either general or specific personal jurisdiction.

---

[5] The parties agree that the Agreement is to be construed in accordance with Delaware law.  (Pl.'s Opp'n Mot. Dismiss, Doc. # 16, at 15 n.16; Defs.' Corrected Mem. Supp. Mot. Dismiss, Doc. # 9-2, at 14 n.10; Defs.' Ex. 1, Doc. # 7-2, at 1).

1    *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 (1984).

2        A court exercises specific personal jurisdiction[6] over a defendant where "the cause of

3    action arises out of or has a substantial connection to the defendant's contacts with the forum."

4    *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir.

5    2002) (citation omitted).  The Ninth Circuit analyzes specific jurisdiction according to a three-

6    prong test:

7        (1) The non-resident defendant must purposefully direct his activities or
         consummate some transaction with the forum or resident thereof; or perform
8        some act by which he purposefully avails himself of the privilege of conducting
         activities in the forum, thereby invoking the benefits and protections of its laws;

9        (2) the claim must be one which arises out of or relates to the defendant's forum-
10       related activities; and

11       (3) the exercise of jurisdiction must comport with fair play and substantial
         justice, i.e. it must be reasonable.
12
     *Boschetto*, 539 F.3d at 1016 (quotation omitted).  "The plaintiff bears the burden on the first
13
     two prongs.  If the plaintiff establishes both prongs one and two, the defendant must come
14
     forward with a compelling case that the exercise of jurisdiction would not be reasonable.  But
15
     if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be
16
     dismissed."  *Id*. (quotation omitted).
17
         For part one of the three-part test, the Ninth Circuit has "analyzed cases that sound
18
     primarily in contract ... under a purposeful availment standard."  *Id*. (quotation omitted).  "A
19
     showing that a defendant purposefully availed himself of the privilege of doing business in a
20
     forum state typically consists of evidence of the defendant's actions in the forum, such as
21
     executing or performing a contract there.  By taking such actions, a defendant purposefully
22
     avails itself of the privilege of conducting activities within the forum State, thus invoking the
23
     benefits and protections of its laws.  In return for these benefits and protections, a defendant
24
     must–as a quid pro quo–submit to the burdens of litigation in that forum."  *Schwarzenegger*
25

26   _____

27       [6] A court can also exercise general personal jurisdiction if the defendant's contact with
     the forum is "substantial, continuous and systematic."  *Helicopteros Nacionales,* 466 U.S. at
28   414-15.  D&P does not contend that the Court has general personal jurisdiction over Med-1
     or that Med-1 has contacts with California are "substantial, continuous and systematic."  *See
     id.*

1   *v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quotations omitted).  "Our

2   evaluation of the jurisdictional significance of a defendant's contract or other business in the

3   forum is not rigid and formalistic, but rather practical and pragmatic." *Boschetto*, 539 F.3d at

4   1016 (quotation omitted).  "In doing so, [courts] are guided by the Supreme Court's

5   admonition that the formation of a contract with a nonresident defendant is not, standing alone,

6   sufficient to create jurisdiction." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

7   478 (1985) ("If the question is whether an individual's contract with an out-of-state party *alone*

8   can automatically establish sufficient minimum contacts in the other party's home forum, we

9   believe the answer clearly is that it cannot.") (emphasis in original)).

10      In *Burger King Corp.*, the Supreme Court held that a Michigan franchisee had

11   purposely availed himself of the privilege of conducting activities in Florida when the

12   franchisee "entered into a carefully structured 20-year relationship that envisioned continuing

13   and wide-reaching contacts with Burger King in Florida." *Burger King Corp.*, 471 U.S. at 480.

14   The franchise agreement required the franchisee's "voluntary acceptance of the long-term and

15   exacting regulation of his business from Burger King's Miami headquarters."  *Id.*

16   Additionally, in explaining why the court of appeals erred in holding that the Florida court did

17   not have personal jurisdiction over the franchisee, the Supreme Court stated: "we believe the

18   Court of Appeals gave insufficient weight to provisions in the various franchise documents

19   providing that all disputes would be governed by Florida law." *Id.* at 481.

20      In *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991), a film-maker filed a breach

21   of contract action against a Mexican author and his agent.  The court noted that during the

22   contract negotiations, while the defendants met once with plaintiff in California, plaintiff made

23   the "predominant efforts" to "reach[] out to effect the contract" by traveling to Mexico,

24   Havana, and Barcelona to meet with defendants. *Id.* at 621 (quotation omitted).  However, the

25   Ninth Circuit "concluded, albeit narrowly, that [the Mexican author and his agent] purposefully

26   availed themselves of the privilege of conducting activities in California."  *Id.* at 623.  The

27   decisive factor was that "most of the future of the contract would have centered on the forum"

28   because "the contract concerned a film, most of the work for which would have been

performed in California." *Id.* at 622 ("In looking at the economic reality, it seems that the contract's subject would have continuing and extensive involvement with the forum.") (quotation omitted).

In *Thomas P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247 (9th Cir. 1980), plaintiff was an international grain trader based in California who sold 15 shipments of grain to the defendant, a Costa Rican interest, and who purchased two shipments of grain from the defendant, all over a four-year period. *See id.* at 1249. All contracts specified delivery in Costa Rica and none of the shipments were delivered to or originated from California. *See id.* The court found that plaintiff's California residency, the fact that plaintiff would suffer financial impacts in California, and the parties' use of the mails and telephone between California and Costa Rica were insufficient to establish the purposeful availment prong for California jurisdiction. *See id.* at 1253-54.

D&P and Med-1 exchanged numerous telephone calls, e-mails and mailings during the course of their negotiations and business relationship. (Assomull Decl., Doc. # 15-8, ¶ 17; Nasr Decl., Doc. # 15-3, ¶ 15; Fischer Decl., Doc. # 7-3, ¶ 17; Schriefer Decl., Doc. # 7-4, ¶ 22). This is insufficient to establish that Med-1 purposely availed itself of the of the privilege of conducting activities in California. *See Thomas P. Gonzalez Corp.*, 614 F.2d at 1254 ("The [defendant] validly argues that use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the state.") (citation omitted); *see also Roth*, 942 F.2d at 622 (same); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 816 (9th Cir. 1988) ("[N]o authorized agents of [defendant] were alleged to have performed or executed any portion of the contract in California. The parties conducted contract execution and termination by international mail. Such contacts are insufficient to constitute an act purposefully availing [defendant] of California laws.") (citation omitted). All of the face-to-face meetings between the parties in this case took place outside of California, and the Agreement was executed by both parties in Maryland. (Fischer Decl., Doc. # 7-3, ¶¶ 15-16; Schriefer Decl., Doc. # 7-4, ¶¶ 14, 18-21; Assomull Decl., Doc. # 15-8, ¶¶ 3, 17-18). Nasr and Schriefer initially met on a flight from San Diego to Washington, D.C.

(Nasr Decl., Doc. # 15-3, ¶ 5).  To the extent this qualifies as a relevant "contact[]" with the forum" by Med-1, *Glencore Grain Rotterdam B.V.*, 284 F.3d at 1123, it constitutes the type of "minimal physical presence in the forum" which "work[ed] in [defendant]'s favor" in *Roth*. *Roth*, 942 F.2d at 622 (referencing a single meeting in the forum: "[Defendants] were in Los Angeles for other purposes when each met individually with [plaintiff].  While we concede that negotiations did take place at that time, it should be borne in mind that temporary physical presence in the forum does not suffice to confer personal jurisdiction.") (quotation omitted).

Unlike the facts in *Burger King Corp.*, the Agreement did not require "the long-term and exacting regulation of [Med-1's] business from [D&P's [La Jolla] headquarters," and the Agreement provides that it is to be interpreted in accordance with the law of Delaware–not California.  *Burger King Corp.*, 471 U.S. at 480-81; Defs.' Ex. 1, Doc. # 7-2, at 1.  Unlike in *Roth*, where "the contract's subject [i.e., the production of a film] would have continuing and extensive involvement with the forum [i.e., California]," the subject of the Agreement was focused on the sale of MMFs in India.  *Roth*, 942 F.2d at 622; Defs.' Ex. 1, Doc. # 7-2, at 1; FAC, Doc. # 3, ¶¶ 9-11, 14).  There are additional allegations that D&P introduced Med-1 representatives "to two potential agents for the sale of MMFs in Jordan and Iraq." (FAC, Doc. # 3, ¶ 17; *see also id.*, ¶¶ 18-19).  There is no allegation or evidence that Med-1 sought to sell MMFs to California buyers or that Med-1 requested D&P to seek out potential buyers in California.

The fact that "[t]he two principals of D&P met on numerous occasions in San Diego to discuss D&P's relationship with Med-1" (Assomull Decl., Doc. # 15-8, ¶ 17), represents only D&P's internal and unilateral activity, and is insufficient to confer personal jurisdiction on Med-1.  *See McGlinchy*, 845 F.2d at 816 ("[Plaintiffs]' statement that they performed 90% of their activities in the Bay Area, even if accurate, describes only unilateral activity.... [S]uch activity fails to create personal jurisdiction over [defendant].").  The fact that D&P is a California resident and that Med-1's termination of the Agreement allegedly caused a California resident injury is likewise insufficient to confer personal jurisdiction.  *See Thomas P. Gonzalez Corp.*, 614 F.2d at 1253 ("The [defendant] correctly notes that only its activities

- 13 -

09cv1142 WQH (BLM)

1   in California, and not [plaintiff]'s, can supply the basis for jurisdiction.  It is not sufficient that

2   the plaintiff is a California resident, or that an act outside California imposes an economic

3   burden on a California resident.") (citations omitted); *see also Gray & Co. v. Firstenberg*

4   *Machinery Co., Inc.*, 913 F.2d 758, 760-61 (9th Cir. 1990) ("The foreseeability of causing

5   injury in another state is not a sufficient basis on which to exercise jurisdiction.") (citing

6   *Burger King Corp.*, 471 U.S. at 474).

7        The Court concludes that D&P has failed to satisfy its burden of showing that Med-1

8   purposefully availed itself of the privilege of doing business in California.  D&P has failed to

9   satisfy its burden of establishing the first prong of the Ninth Circuit's three-prong specific

10  jurisdiction test. *See Boschetto*, 539 F.3d at 1016.  Therefore, "the jurisdictional inquiry ends."

11  *Id.*  ("[I]f the plaintiff fails at the first step, the jurisdictional inquiry ends....") (quotation

12  omitted).

13  **IV.    Dismiss or Transfer the Action**

14       Having concluded that the Court lacks personal jurisdiction over Med-1, the Court must

15  determine whether to dismiss this action pursuant to the Federal Rule of Civil Procedure

16  12(b)(2) or transfer this action to another court pursuant to 28 U.S.C. § 1631.  *See Pamplona*

17  *ex rel. Pamplona v. Hernandez*, No. 08cv2205, 2009 WL 578578, at *3 (S.D. Cal., Mar. 5,

18  2009) (after concluding that the court did not have personal jurisdiction over two defendants,

19  "[t]he Court must determine whether transfer [pursuant to § 1631] is more appropriate than

20  dismissal").  "The transfer of civil actions among federal courts to cure jurisdictional defects

21  is governed by 28 U.S.C. § 1631." *Cruz-Aguilera v. INS*, 245 F.3d 1070, 1074 (9th Cir. 2001).

22  Section 1631 provides: "Whenever a civil action is filed in a court ... and that court finds that

23  there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such

24  action ... to any other such court in which the action ... could have been brought at the time it

25  was filed...." 28 U.S.C. § 1631.  A § 1631 transfer is appropriate if "(1) the transferring court

26  lacks jurisdiction; (2) the transferee court could have exercised jurisdiction at the time the

27  action was filed; and (3) the transfer is in the interest of justice." *Cruz-Aguilera*, 245 F.3d at

28  1074.

As discussed above, this Court lacks jurisdiction over Med-1.  Med-1 filed a Motion to Transfer simultaneously with the Motion to Dismiss, moving the Court to transfer this action to the United States District Court for the District of Columbia or, alternatively, to the United States District Court for the District of Maryland, Greenbelt Division.  (Doc. # 6).  As Med-1's principal place of business is in Bethesda, Maryland (Fischer Decl., Doc. # 7-3, ¶ 4), and the Agreement was negotiated in part and executed in Bethesda (*id.*, ¶ 15; Schriefer Decl., Doc. # 7-4, ¶ 14; Assomull Decl., Doc. # 15-8, ¶ 3), the United States District Court for the District of Maryland "could have exercised jurisdiction at the time the action was filed." *Cruz-Aguilera*, 245 F.3d at 1074; *see* 28 U.S.C. 1391(a) ("A civil action wherein jurisdiction is founded only on diversity of citizenship may ... be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...").  The sole remaining issue is whether transfer is "in the interest of justice." *Cruz-Aguilera*, 245 F.3d at 1074.

"When determining whether transfer is in the interest of justice, courts have considered whether the failure to transfer would prejudice the litigant, whether the litigant filed the original action in good faith, and other equitable factors."  *Id.* (citation omitted).  "Normally transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is 'time-consuming and justice-defeating.'" *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 467 (1962)).

There is no indication from the record that D&P filed the action in this Court in bad faith.  In response to the Motion to Dismiss for improper venue, D&P requested that the Court transfer, rather than dismiss, the action.  (Doc. # 16 at 13 n.14).  The Court finds that dismissing this action would be "time-consuming and justice-defeating." *Goldlawr, Inc.*, 369 U.S. at 467.  In the interest of justice, this action shall be transferred to the United States District Court for the District of Maryland, Greenbelt Division pursuant to 28 U.S.C. § 1631.

//

//

1  **V.    Conclusion**

2         IT IS HEREBY ORDERED that the Clerk of the Court shall **TRANSFER** this action

3  to the United States District Court for the District of Maryland, Greenbelt Division pursuant

4  to 28 U.S.C. § 1631.  The Motion to Transfer pursuant to 28 U.S.C. § 1404(a) is **DENIED** as

5  moot.  (Doc. # 6).  The Motion to Dismiss is **DENIED** without prejudice to refile before the

6  transferee court.  (Doc. # 9, 20).

7  DATED:  October 7, 2009

8                                                     *William Q. Hayes*
                                                   **WILLIAM Q. HAYES**

9                                                   United States District Judge